Eric L. Siegel (*pro hac vice forthcoming*)
D. Michelle Douglas (State Bar No. 019743)
KALBIAN HAGERTY, LLP
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
Telephone: (202) 223-5600
Facsimile: (2020 223-6625
E-mail: esiegel@kalbianhagerty.com
E-mail: mdouglas@kalbianhagerty.com

Nicholas J. Enoch (State Bar No. 016473)
Clara S. Acosta (State Bar No. 036044)
LUBIN & ENOCH, P.C.
349 North Fourth Avenue
Phoenix, Arizona 85003
Telephone: (602) 234-0008
Facsimile: (602) 626-3586
E-mail: nick@lubinandenoch.com
E-mail: clara@lubinandenoch.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ian Day,<br>5478 East Cholla Street<br>Scottsdale, AZ 85254,<br><br>            Plaintiff,<br>v.<br><br>City of Phoenix, a municipality of<br>The State of Arizona,<br>200 West Washington Street<br>Phoenix, Arizona 85003<br>Serve: City Clerk<br><br>            Defendant. | CASE NO. |

## COMPLAINT

1.     Plaintiff, Ian Day, by and through his undersigned counsel, hereby alleges and states the following:

## INTRODUCTION

2.     This is an action for declaratory, monetary, and injunctive relief against Defendant City of Phoenix (hereinafter "City") for deprivation of Plaintiff's rights and

privileges and retaliation against him in violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over the subject matter of this civil action pursuant to the United States Constitution, 28 U.S.C. §§ 1331, 1343, 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988.

4.  Venue is proper pursuant to 28 U.S.C. § 1391 because Plaintiff was employed by the City, and the decision to take adverse employment actions against him, including but not limited to an adverse performance appraisal, being placed on administrative leave, creating and subjecting Plaintiff to a retaliatory hostile work environment as a result of his protected speech and ultimately terminating his employment was made in the City of Phoenix.  Also, all pertinent records underlying this action are located in this judicial district.

## PARTIES

5.  Plaintiff, Ian Day is a citizen of the United States and a resident of the State of Arizona. At all times relevant to this suit, he has been employed by the City.

6.  Defendant City of Phoenix ("City") is a municipality, legal and corporate body politic and local governing body of the City of Phoenix existing under the laws of the State of Arizona and is a "person" within the meaning of 42 U.S.C. § 1983. During the relevant time period, the City was Plaintiff's employer for purposes of his claim under 42 U.S.C. § 1983 for violations of his First Amendment rights.

## STATEMENT OF FACTS

7.  In 2015, Plaintiff, Ian Day, began working as a Senior Water Quality Inspector in the City's Environmental Services Division.

8.  Mr. Day was a well-respected employee who succeeded in his position. However, that changed once he started "blowing the whistle" and reporting on corporate entities of the City violating federal, state and local laws and City officials complicit in those illegalities as a result of alleged corruption or otherwise.

9. In late 2018, the Criminal Division of the U.S. Environmental Protection Agency ("EPA") investigated a property previously owned by a business named "Closed Loop Recovery" ("CLR").  It requested the City's assistance in the investigation.

10. On behalf of the City, Mr. Day was assigned to the inspection, which revealed that CLR stored millions of pounds of hazardous waste (composed of crushed leaded glass and mixed shredded electronics waste) outdoors and exposed to the elements. Furthermore, the storage area was connected to a drain that sent all of the runoff to an unknown destination.

11. Additionally, the EPA discovered that the lead dust levels at the site were so high that its crews were required to wear full respiratory protective gear; the lead dust had accumulated at the site over many years.

12. Mr. Day's review of the City's files revealed that his supervisors had previously approved and signed off on CLR's compliance with environmental laws and regulations.  That City approval was given repeatedly despite the fact that a City inspector reported the existence of a drain and the lack of meaningful barriers to prevent runoff from entering the drain.

13. Mr. Day required that the company that was managing the CLR site to identify what the subject drain was connected to. After Mr. Day's instructions were ignored, the City ultimately ordered *him* to drop the issue and close the case. This order was odd to Mr. Day given the blatantly illegal dumping that was taking place.

14. Still, his supervisors opted to perform a "video inspection" of a storm drain upstream of the CLR site and summarily concluded that the drain was not connected to the City's water supply ***without any evidence*** to support that conclusion.

15. Mr. Day expressed concern to his superiors that the "inspection" was inadequate, but he was told that if he pursued the issue any further, he would face disciplinary action.

**Given His Supervisor's Lack Of Lawful Response And Orders To Overlook The Environmental Violations He Reported, Mr. Day Engaged In Protected Speech By Bringing His Concerns To Outside Agencies**

16.     In March 2019, Mr. Day reported to his superiors and the Arizona Department of Environmental Quality ("ADEQ"), the State's environmental enforcement department, his ongoing concerns related to environmental dumping and contamination and specifically pointed to a company called "Far West Supply." Specifically, Mr. Day reported Far West Supply's storage of concentrated acidic hazardous waste that was leaking into the ground and coming into contact with containers of another hazardous waste product known to be dangerously reactive to certain acids. This created an immediate chemical explosion/decomposition hazard less than 100 feet from a residential neighborhood and across the street from a school, which was in session at the time.

17.     During this March incident, Mr. Day identified the chemical explosion/ incompatibility hazard and sought to contact the fire department, warn them of the site hazards, and dispatch them to assess and resolve the potential explosion hazard.

18.     Another supervisor, Jennifer Calles, intervened and ordered Mr. Day to not call the fire department to Far West, based upon her false assertions about the safety and reactivity of methylene chloride. When Mr. Day questioned this order given the known volatility of this chemical compound, Ms. Calles began to repeatedly make false allegations against Mr. Day to attack his credibility and reputation.

19.     Jesus Portillo, Mr. Day's immediate supervisor, ultimately issued a Notice of Violation to Far West Supply (perhaps because the State entity was involved and "watching").  Despite the Notice of Violation being issued, Mr. Day's report was not well received, and Mr. Portillo and other managers ordered him to stop "harassing" this business.

20. In carrying out these inspections and uncovering environmental violations, Mr. Day was carrying out his job responsibilities faithfully.

21. In May of 2019, Mr. Day's supervisors pressured him to issue a Letter of Closure to Far West and to ADEQ, stating that Far West was in full compliance with the law. Knowing this to be a false representation and refusing to be party to an act of fraud internally or to an outside regulator, Mr. Day took another City inspector with him as a witness and drove to the Far West site, where he caught the employees of Far West in the act of committing a crime, that is hauling the barrels of waste from their hazardous waste storage yard to the City of Phoenix waste transfer station.

22. Photographic and physical evidence confirmed that many of the barrels still held liquid, and interviews with staff at the transfer station confirmed that the Far West employees had made fraudulent representations to the transfer station staff for the purpose of deceiving them into granting approval to take the waste.

23. Mr. Day's supervisors - instead of commending him for catching a crime in progress, identifying and helping mitigate a serious hazard to fellow employees, and preventing the City from improperly issuing an inaccurate report to ADEQ – were furious and accusatory.

24. Mr. Day's supervisors once again accused him of harassing the company in question – going as far as to baselessly assert that he had "chased" or "tailed" the Far West employees to the transfer station, despite pictures and witness testimony confirming that Mr. Day did not follow their vehicle but instead had determined their route to and from the landfill by following the trail of chemicals they had spilled on the way there. As far as Mr. Day could determine, the assertion that he had chased or tailed the Far West vehicle had been made up out of thin air.

25. Shortly after making this discovery, Mr. Day reported this illicit activity outside of his chain of command to the City's Office of Environmental Programs, who advised him to report this (and other activity he had observed, including apparent

anticompetitive fraud activities by businesses avoiding paying permit fees but tapping into the City's stormwater sewer system) to the City of Phoenix Integrity Committee. Mr. Day promptly did so.

26.    Mr. Day's reports to the Office of Environmental Programs and the City's Integrity Committee were not part of, nor required by, his job responsibilities.

27.    In June of 2019, shortly after making this report and attending a series of interviews with the investigator assigned to the case, Mr. Day experienced harassment by several of the individual supervisors named in his complaint.

28.    Unbeknownst to him at the time, despite his complaints being ostensibly anonymous, the Integrity Committee investigator assigned to the case, Donna Love, had revealed his identity to the accused supervisors and was thereby allowing them to discuss the case amongst themselves in an apparent attempt to coordinate their testimony, as discussed in more detail below.

**Mr. Day Uncovers Improper City Actions In Overlooking Company Failures To Follow Stormwater Permit Requirements And To Engage In Anti-Competitive Practices And Reports It**

29.    As a private citizen, Mr. Day was a member of the Arizona Water Association ("AZ Water").  Through his work for the City, he uncovered an apparent scheme where private company members of AZ Water were permitted by City officials (including his supervisors in his department) to tap into the City's stormwater sewer and dump their stormwater, in violation of EPA requirements under the Municipal Separate Storm Sewer System ("MS4") Permits with the State and City and the City's own civil code.

30.    In late 2018, Mr. Day began to uncover and report on what he believed to be a conspiracy to engage in anti-competitive practices which harmed competing engineering firms who were not a part of the "scheme."  Illegal stormwater dumping and not paying permit fees harmed other businesses who were required

to maintain stormwater on their properties at their own expense.  These illegal actions also negatively impacted the City's revenue from stormwater permit fees.

31.    These anticompetitive businesses did not pay to maintain their stormwater on site, or pay to dispose of it, or pay to maintain a disposal system, and were (on several occasions) caught using their discharge points to release substances identified as hazardous waste and/or runoff from hazardous material storage areas.  Rather, they simply "dumped" their materials into the City's sewer system without a permit, a violation of the MS4 Permit with the City and of the City's own municipal code.

32.    Mr. Day reported this alleged conspiracy and illegal dumping to City officials, including but not limited to City Manager Ed Zuercher, Toni Maccarone, Shannon Bell, Donna Love, Stephen Wetherell, Linda Palumbo, Jennifer Calles, Jesus Portillo, Luis Weisel, Clayton Freed, Tracy Sallen, Brandy Kelso (current president of AZ Water and current City of Phoenix employee), Patty Kennedy, and Kathryn Sorenson (now-former City employee).

33.    After raising these alleged conspiracy issues to engage in illegal dumping of stormwater and other substances in City drains, Sallen, Palumbo, Freed, Kennedy, Calles, Bell, Maccarone, Zuercher, Weisel, and Kelso responded by working to take adverse actions against Mr. Day, including to ultimately terminate his employment.

34.    For example, after confronting Ms. Sorenson over email, public records requests made Mr. Day aware of the fact that Ms. Sorenson (or another of the private company alleged co-conspirators) retained an attorney and requested copies of the records Mr. Day had obtained via public records requests. After the attorney received those files, Ms. Sorenson appears to have immediately (or shortly thereafter) resigned her position as Director of the City's Water Services Division.

35.    Still another example, Mr. Day exercised his right as a private citizen to request public records and obtained emails between one of Mr. Day's supervisors (Linda

Palumbo) and one of the City's engineering department supervisors (Keith Kesti). Those emails included a final version of a pertinent document they were discussing. In this exchange, Ms. Palumbo was asked to review engineering specifications, which explicitly outlined clear intent by the private engineering firm applicant to violate MS4 discharge restrictions. Ms. Palumbo's response indicated that she read and signed her approval on the sections of the plans which violated City Code and Federal MS4 permit requirements.

36.    In mid-2019, Mr. Day forwarded these emails between Ms. Palumbo and Mr. Kesti, as well as other damning communications, to the City's Integrity Committee. Mr. Day disclosed what appeared to be happening, why he believed it was happening (illegal stormwater and non-stormwater dumping and anticompetitive behavior) and asked for the City to stop that illegal activity.

37.    Continuing into 2019, Mr. Day also uncovered and documented, through photographs and maps, evidence that these illicit stormwater sewer connections were being found and intentionally ignored, despite requirements within the City's MS4 permit which obligated them to take actions to proactively identify and remove these connections. What those photographs showed was that a small percentage of these illegal connections he was describing to City officials were actually being mapped and displayed on the City's internal engineering maps by individuals working for the City who were not aware of the fact that they uncovered anything nefarious. Mr. Day's supervisors were involved in the mapping project. They appear to have repeatedly fabricated excuses for these irregularities, claiming the connections were capped – based on erroneous data – or did not exist.

38.    Mr. Day did not find these excuses credible. He was on the mapping team too. He was directly involved in enough inspections which found these "nonexistent" connections, and he was directly involved in enough aspects of the City's permit compliance program to realize that things were not adding up.

39.   The disconnect was simple to identify.   Specifically, the City Planning and Development Department claimed that the Water Department was responsible for approving and managing the permits to operate these connections, while the Water Department claimed that the connections largely did not exist at all, and the few that did were being managed by the Planning and Development Department.

40.   In truth, neither department was issuing or managing permits to operate the devices and/or sewer connections at issue, but Planning and Development was still granting approval to construct them, ultimately resulting in a revenue loss of millions of dollars to the City in uncollected permit fees.   This also led to the creation of a significant compliance liability from hundreds or thousands of connections, which were being operated without any of the mandatory oversight or approval required by federal, state or local law.

41.   To verify the reality of the issue, Mr. Day went out to some of these "nonexistent" street connections himself and opened the catch-basin lids. Once those lids were open, he confirmed his worst suspicions: illegal connection after illegal connection existed.

42.   After bringing these facts to the attention of his supervisors who took no action to address the situation but rather harassed him and ordered him to stand down, Mr. Day's supervisor told him that an agent from the ADEQ, Chris Henninger, "had been consulted on the decision to continue to allow the operation of connections." This apparent ADEQ complicity seemed odd to Mr. Day because the City's own rules and permit defined it as "illicit."

43.   On June 26, 2019, Mr. Day contacted Mr. Henninger to confirm this information conveyed by his supervisor and to obtain a copy of whatever agreement had been reached between the City and ADEQ. Mr. Day copied his supervisors on this email chain.

44.  Upon seeing that Mr. Day had revealed to Mr. Henninger that the program was not being operated as described in the City Code, Linda Palumbo promptly sent an email to Mr. Henninger to "correct" Mr. Day.

45.  Mr. Day knew that the information that Ms. Palumbo provided to Mr. Henninger in her "correction" email was substantively false, and so Mr. Day sent a follow-up email to Mr. Henninger, informing him of the fact that Ms. Palumbo had, in her 'correction' email, provided false information.

46.  By informing Mr. Henninger of the improper actions taking place, and of Ms. Palumbo's false claims, Mr. Day stepped outside of the chain of command and revealed information to Mr. Henninger which could have reasonably led to a criminal investigation of Linda Palumbo's actions.

47.  Despite doing his lawful duty and speaking out to correct illegal actions, Mr. Day was admonished for this action and, in a later "Notice of Inquiry" from the City, accused of "sexism" for questioning her.

48.  Mr. Day's communications to individuals outside of Mr. Day's chain of command are protected disclosures under the First Amendment.

49.  In addition, some of Mr. Day's emails to the Integrity Committee laid out the case that Linda Palumbo was deliberately and intentionally misdirecting her subordinate internal investigative staff assigned to identify and eliminate this exact type of illicit connections, which private AZ Water-affiliated engineering firms were permitted to make. These communications to City's Integrity Committee outside of Mr. Day's chain of command are protected disclosures under the First Amendment.

50.  Mr. Day uncovered what he also believed were further problems in his department that raised red flags about potential corruption and/or mis-, mal- or non-feasance by City managers.

51.  Mr. Day discovered his supervisor Linda Palumbo ordered her entire "Illicit Discharge Detection and Elimination" ("IDDE") team into a camera-truck and

ordered them to spend all of their time performing "video inspections" of the entire network of *main-lines* of the City sewer system as busy-work to distract them from actual investigative duties. This misdirection had the apparent result of allowing Palumbo to claim they her team was constantly busy "investigating" without her having to worry that they would actually find anything.

52. The one day that Mr. Day went around popping open those catch basin lids, he found more illicit connections than the entire IDDE team found in an average year!

53. Mr. Day also produced to City management both within and outside of his chain of command a "Cost Analysis" document, which demonstrated that his supervisors were aware of the fact that direct sewer connections were being tied into City catch basins – not into the main lines in the street, where IDDE team members were being ordered to look for them.

54. Mr. Day's efforts to uncover wrongdoing as a private concerned citizen (and not through his duties as a public employee) were met with further retaliation at work.

55. On May 6, 2019, the City, through its managers, disciplined Mr. Day for "engaging AZ Water in correspondence criticizing organizational decisions."

56. Disciplining Mr. Day for unsubstantiated allegations related to events that occurred outside of the workplace did not make sense to Mr. Day, as he was participating as a private citizen and not in his role as a public servant. The City's allegations in this instance were further emblematic of the City's ongoing retaliation against him. In an attempt to somehow tie this discipline to Mr. Day's employment, the notice of discipline issued to Mr. Day summarily asserted "there is a concern for unprofessional criticism of your coworkers and peers." That notice did not offer specific details or otherwise substantiate the source(s) of any such "concerns."

57. Also in May 2019, Mr. Day reported to Tricia Balluff that the City was authorizing the construction and operation of storm water pre-treatment devices on private property connected to the City's Municipal Separate Storm Sewer System

("MS4") without requiring companies to obtain permits required for such operations. Permits are required not only by City Code but also by the EPA as part of its MS4 Permit process.

58. Pursuant to Ms. Balluff's recommendation, Mr. Day reported this issue to his superiors, but no action was ever taken.

59. As a result of this non-action, in June and July of 2019, after a series of incidents which caused Mr. Day to conclude that the issues he reported were being mishandled, Mr. Day escalated his complaints to the City's Integrity Committee, who opened an investigation.

60. Information obtained via public records requests revealed that by June 21, 2019 – shortly after the investigation was opened and while the investigation was still ongoing – the Integrity Committee investigator on the case had revealed Mr. Day's identity as the whistleblower to Jennifer Calles and Linda Palumbo, two employees whose actions had been the subject of his whistleblowing complaints. This exchange revealed that the accused individuals not only knew Mr. Day's identity, but that they knew specifics of his complaint and were actively discussing this information amongst themselves prior to being interviewed by the investigator; coordinating their testimony and discussing how to handle scheduled meetings with Mr. Day to avoid providing him with information which could incriminate them.

61. Mr. Day's supervisors, Mr. Portillo and Ms. Palumbo, also went to great efforts to silence and discipline him for reporting concerns about environmental contamination.

62. For example, Mr. Day was reprimanded after identifying a spilled material from a sanitary sewer overflow as sewage because his report was "misleading." However, Mr. Day properly identified the material at issue as sewage and his methods were consistent with the way he was specifically instructed to handle such matters in another case.

63. In or around July 2019, in retaliation for Mr. Day's complaints, Mr. Portillo began inappropriately citing Mr. Day for numerous workplace "violations." For example, Mr. Day was repeatedly disciplined for violating the City's "Uniform Policy" despite the fact that the policy was not enforced against other employees.

64. Mr. Day was also cited for coming to the office late after he had suffered a workplace injury and had taken paid time off to treat that injury. Mr. Portillo also cited Mr. Day for "asking questions" about his job functions that Mr. Portillo apparently believed was insubordinate. Mr. Day reported these retaliatory acts to the City, but no action was taken.

65. In September 2019, Mr. Day's supervisor, Ms. Calles, advised that Mr. Day needed to attend mandatory weekly coaching sessions with Mr. Portillo due to "ongoing performance issues." The sessions provided further opportunities for harassment as Mr. Portillo repeatedly ridiculed Mr. Day's work performance without providing any examples of Mr. Day's alleged deficiencies.

66. Mr. Day was also advised that he was no longer permitted to communicate with City employees outside of the Water Department without Mr. Portillo's approval and that further adverse actions would be taken if he "disagreed" with his superiors.

67. Mr. Portillo repeatedly became explosively angry when Mr. Day raised any concerns to him.

68. In fact, Mr. Portillo's outburst during his first "coaching" session with Mr. Day was so alarming that another City staff member was required to be present at all such meetings going forward. Mr. Day reported to the City's Human Resources Department ("HR") that Mr. Portillo's outburst, coupled with the fact that Mr. Day planned to continue exposing improper activities rather than take part in them, made him fear for his physical safety, but no action was taken to address these concerns.

**After Repeated And Escalating Improper Actions By City Officials In Response To Mr. Day's Reports Of Environmental Law Violations, He Escalates His Concerns To State Legislators To Take Action**

69.   On or about October 30, 2019, the fire department and Mr. Day were both called to the site of a discharge behind a business Mr. Day had previously inspected named "Cartz Partz". Upon arrival, Mr. Day observed a discharge, which appeared identical to previous discharges from the same company at the same location that had tested with a pH level to qualify the substance as "characteristic" hazardous waste. Mr. Day reported safety and environmental concerns about this hazardous waste, as the waste had been dumped directly into a residential neighborhood right before Halloween, contaminating several blocks worth of streets which would soon be hosting Trick-Or-Treating children.

70.   In light of this special hazard, Mr. Day recommended the spill be handled immediately and the material treated as hazardous waste until it could be confirmed otherwise.

71.   To his surprise, however, not only did Mr. Day's supervisors refuse to act on this information, but Mr. Day was outright accused by Linda Palumbo of lying about having previously found hazardous waste discharges at the site. After showing Ms. Palumbo the inspection report and sample data proving that hazardous waste had been found at the site, Mr. Day asserted that something needed to be done if for no other reason than to make sure there was no potential for any children to become exposed. In response, Ms. Palumbo called Mr. Day into her office where she not only repeated her assertion that Mr. Day was lying but went so far as to threaten Mr. Day and advise that he "needed to be very careful" with voicing his legitimate concerns.

72.   Mr. Day considered this statement by Ms. Palumbo to be a threat, which he immediately reported to Human Resources ("HR"). Subsequent sworn testimony by Ms. Palumbo has revealed that this threat was never addressed or investigated by the HR investigator, despite claims by that investigator to the contrary.

73. The same month, Mr. Day was issued a "Notice of Inquiry" ("NOI") related to the disappearance of a cell phone he reported missing approximately six months earlier. This was the first time he ever heard about City concerns about a cell phone he reported missing.

74. Mr. Portillo also removed Mr. Day from the rotation for Acting Chief and on-call, which denied Mr. Day opportunities for increased pay and overtime.

75. In response to this continued harassment by his supervisors for carrying out his job responsibilities faithfully, Mr. Day again contacted the City's "Integrity Line" to report the City's failure to respond to his concerns regarding hazardous waste dumping, inequitable treatment, failure of City officials and certain businesses to abide by City code and permit requirements, retaliation by his superiors, and an overall hostile work environment. No action was ever taken.

76. After reaching a point where the public was being put in danger and he was himself either being gaslighted, ignored or harassed for faithfully reporting illegal environmental dumping and failure of City officials to take action, in or around October 2019, Mr. Day contacted an Arizona state legislator to escalate his concerns as a private citizen. He ultimately met with legislative staff and provided testimony and other information. His disclosures are protected speech under the First Amendment.

77. Specifically, Mr. Day reported to the State Senate a series of incidents related to the City's Water Services Division, HR Department and Integrity Committee. He reported suspected fraud, anticompetitive activities, and public safety threats. He reported, among other issues, that City supervisors were ordering employees inspecting privately operated industrial facilities to provide fraudulent information to State authorities, to not report clear crimes-in-progress (some of which directly endangered public safety and the safety of other City employees) to the proper authorities, to engage in unethical and arbitrary enforcement actions against certain private companies, and to ignore all other private companies altogether.

78.   Mr. Day further reported to the State Senate that the HR Department and Integrity Committee became involved after the issues were reported to them internally.   He reported that the Integrity Committee had responded by improperly closing his complaints based on information that the City knew to be objectively false (such as the incorrect assertion that methylene chloride is not reactive with certain acids, the false assertion that hazardous waste had not been found at Cartz Partz, etc.), outing him to the supervisors accused of misconduct, and assisting those supervisors accused of misconduct in their efforts to retaliate against him.

79.   In December 2019, after it became clear that the City was not only failing to address substantial misconduct but had been actively working in secret to support that misconduct, Mr. Day reached out to the EPA, who responded by opening a criminal investigation into the City of Phoenix. As of this time, to his knowledge, the investigation is still ongoing.

80.   In May of 2020, Mr. Day contacted the Arizona Attorney General's ("AZAG") Office and reported his suspicions of criminal activity by the City, including the adverse actions he had experienced up to that point. In response to Mr. Day's inquiries, the Major Fraud Division of the AZAG's Office opened an investigation into the City. As of this time, to his knowledge, the investigation is still ongoing.

**Soon After Reporting Alleged Corruption And Illegalities To The State Senate, Mr. Day Is Disciplined Further**

81.   In November 2019, Mr. Day took medical leave to undergo shoulder surgery. When he returned to work in December 2019, he met with Ms. Calles and HR. During this meeting, Mr. Day was informed that he was being placed on administrative leave for unspecified "misconduct."

82.   Mr. Day remained on administrative leave until his termination nearly a year and a half later.

**Despite Conscientious And Successful Job Performance, The City Issues Mr. Day
A Negative Performance Review In Retaliation For His Protected Speech**

83. On February 3, 2020, Mr. Day was issued a negative performance review for the first time during his tenure at the City. He was also denied a pay increase.

84. Mr. Day appealed that negative performance review and pay denial. He was denied his appeal rights. Rather, he was advised that his appeal was "on indefinite hold."

85. On February 5, 2020, the City issued yet another Notice of Inquiry ("NOI") to Mr. Day for purported "noncompliance with performance expectations."

86. Yet, again, no specific instances of noncompliance were cited.

87. Instead, the City apparently took issue after Mr. Day complained about Ms. Palumbo's threat to modify his leave bank if he did not immediately respond to her email, which was sent while he was on vacation.

88. Thereafter, in an effort to escape the hostile work environment to which he was subjected, Mr. Day began applying and interviewing for other positions at the City, including a Safety Analyst II position. He was denied that job.

89. Upon information and belief, Ms. Palumbo spoke poorly of Mr. Day, which influenced the hiring panel's decision to not give Mr. Day the positions for which he interviewed.

90. According to the City's records, the "official" reason Mr. Day was denied the Safety Analyst II position is that he failed "to provide specifics for question number one regarding his education and job experience." However, this justification was simply pretext for retaliation.

91. Post-interview notes by members of the interview panel confirmed the fact that Mr. Day had indeed provided a detailed response to the question. When confronted about this fact, the notes showed that the reasoning for the City denying him the position shifted several times, ending up with the interviewer lacking a defensible

explanation and instead asserting that the reason he was not given the position was due to something else entirely; vague concerns about "soft skills."

92. On April 30, 2020, the City issued a third NOI to Mr. Day. This time, Mr. Day was accused of being "discriminatory against his female superiors" because he asked questions related to his quality assurance work. These claims were meritless, and Mr. Day easily refuted them.

93. The basis of these claims of sexism was – first and foremost on the City's charging document – Mr. Day's aforementioned whistleblowing to Chris Henninger of ADEQ. In effect, the City once again sought to twist Mr. Day's protected disclosures on the misconduct of other employees into a justification for disciplining him, while simultaneously slandering him and attacking his quality of character.

94. Thereafter, the City escalated its retaliatory efforts against Mr. Day. Despite having been absent from the office for months, his supervisors began to repeatedly discipline him for benign issues in retaliation for blowing the whistle and speech protected under the First Amendment.

95. For example, on June 2, 2020, Mr. Day was issued another NOI for an issue that apparently came to the City's attention in October 2019, *seven months earlier*.

96. On September 1, 2020, the City issued Mr. Day a written reprimand related to his cell phone that he reported in 2019 had gone missing in 2019.

97. On September 4, 2020, the City issued Mr. Day a disciplinary notice, which resulted in a one-day suspension. Interestingly, no explanation for this discipline was included.

98. On December 11, 2020, Mr. Day submitted a "Notice of potential constructive discharge" to the City. The notice documented much of the events set forth above.

99. On December 25, 2020, the City issued Mr. Day a three-page response, indicating that it "needs additional time to complete relevant investigations."

100.   By that point in time, the City had already been "investigating" Mr. Day for over a year. The City failed to address the issues Mr. Day set forth in his "Notice of potential constructive discharge."

**The City Further Restricts Mr. Day's Free Speech Rights By Preventing Him From Seeking Public Records Through Proper FOIA Requests**

101.   While on administrative leave, Mr. Day submitted several public records requests to the City. For example, he requested communications between certain City employees pertaining to the so-called "investigations" on him and pertaining to the concerns he raised about the City's alleged involvement in environmental waste dumping and violation of the EPA's MS4 Permit.

102.   On January 26, 2021, the City sent Mr. Day a "Cease and Desist Notice," which stated: "You are advised that you are to immediately cease and desist from continued communications via in person, via phone or via email with any City employee except for the designated contact person below. This includes any City mailbox, such as those designated for submissions to the Integrity Line, Human Resources, or public records requests."

103.   By this "Cease and Desist" Notice, the City was blatantly attempting to not only muzzle Mr. Day, it was also preventing him from continuing to report its illegal and unethical conduct to the City's HR Department and Integrity Committee, appropriate outside government personnel and oversight agencies.

104.   Furthermore, by this "Cease and Desist" Notice, the City attempted to unilaterally absolve itself from its requirements to respond to Mr. Day's lawful public record requests. The City cited no lawful basis for doing this.

**The City Moves Forward With Terminating Mr. Day's Employment**

105.   On March 19, 2021, the City sent Mr. Day a "Pre-Termination Memo ("Memo"). The Memo explicitly noted that the City believed Mr. Day engaged in "work-related misconduct" arising from his alleged disclosure of information related to

"Stormwater Management Plan compliance" to another government body, namely the State legislature. When shown the records the City alleged Mr. Day improperly disclosed to State legislators, Mr. Day immediately identified discrepancies between the documents he was shown and the ones he actually turned over to the State, including what appeared to be unrelated email exchanges and hand-written notes in someone else's handwriting which appeared to have been added to the documents. This caused Mr. Day to conclude that the documents he was shown had clearly been tampered with, a fact he promptly revealed to the City.

106. Nevertheless, Mr. Day denied disclosing privileged and/or confidential records to third parties. He did, however, admit that he escalated his concerns about illegalities and City manager mal- and non-feasance to State legislators for investigation.

107. This justification for Mr. Day's termination – that he reported illegalities and alleged City corruption to State legislators (which is protected First Amendment speech) – is not only a pretext for retaliation but also evidence that his speech was the basis for his termination.

108. Having tried and failed to find a defensible justification to fire Mr. Day, the City searched long and hard for alternative excuses to provide a justification for Mr. Day's firing. The numerous entities Mr. Day blew the whistle to were clearly connected to law enforcement, and thus the disclosures were clearly protected. This protection also applied to the disclosures Mr. Day made to the State legislature as well.

109. Having found nothing else to justify the extraordinary retaliation Mr. Day experienced at their hands, and out of sheer desperation and fear of the consequences of admitting they had been caught aiding and abetting potentially felony-level misconduct and retaliating against a whistleblower by harassing him for over a year at that point, the City supervisor conspirators simply fabricated an explanation by substantively misrepresenting Mr. Day's actions and falsely

accusing him of releasing "privileged" information to the general public rather than to a government entity.

110. To further this objective, they attempted (1) to cover up the fact that City officials considered what Mr. Day did to have been a protected whistleblowing activity, as evidenced by a communication between City Manager Ed Zuercher and the Integrity Committee, along with the subsequent attempt (2) to claim this communication never occurred.

111. Pursuant to the procedures set forth in the Memo, Mr. Day submitted an eighty-five- page response on March 24, 2021.

112. On April 2, 2021, the City sent Mr. Day a "Discipline Notice," which terminated his employment.

113. During his termination process, the attorney representing the City, Shannon Bell, admitted at the recorded hearing that a central underlying reason that Mr. Day was terminated was for what she called "conspiracy theories."  This was a comment she made in direct response to Mr. Day's continued assertion of evidence supporting the conclusion that AZ Water-affiliated companies were exploiting corrupt officials within the City to engineer an illicit anticompetitive advantage over businesses which were not part of the conspiracy by allowing them to "dump" their stormwater into City sewers and also not pay permit fees.  He also presented evidence that AZ Water members working for the City were demonstrably acting on behalf of this private organization to utilize the City's resources to retaliate against individuals who attempted to expose this scheme, including Mr. Day.

## COUNT ONE
### (Free Speech Violation)

114. The foregoing paragraphs are realleged and incorporated by reference herein.

115. Plaintiff's job responsibilities, among others, required him to inspect stormwater connections and potential environmental contamination and dumping by private entities within City limits.

116.   Not only did Mr. Day report environmental law violations and suspected unlawful anti-competitive practices to his supervisors up through his chain of command, he also objected to orders by his superiors to stop reporting such illegal activity, and he refused orders to participate in that and other illegal activity.

117.   He then escalated his concerns with illegal activities and the corrupt and concealment activities of City managers in an apparent conspiracy with AZ Water-affiliated companies to engage in wrongdoing.  He made reports and other disclosures to the City's HR Department and Integrity Committee, a place where he was directed to report waste, fraud and abuse and receive whistleblower protection.

118.   His reports to those City entities outside of his chain of command are not within Mr. Day's job responsibilities.  His reports to those entities are protected speech on matters of public concern, protected by the First Amendment.

119.   Furthermore, Mr. Day's reports to regulators and state legislators of illegal private sector wrongdoing, environmental dumping, and alleged conspiracies and/or complicity of City managers are protected speech on matters of public concern under the First Amendment.  *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006).

120.   Mr. Day's communications with individuals and entities outside of his chain of command were not part of his official job duties.   *Freitag*, 468 F.3d at 545-546.

121.   Unlike his direct submissions to his Water Services Department superiors where he highlighted illegal environmental dumping, Mr. Day's written submissions to the City's HR Department, Integrity Committee, Public Records Department, ADEQ, AZAG, EPA and the State Senate were not within Mr. Day's job duties. He was making those submissions as a private citizen voicing matters of public concern about government fraud, waste and abuse of power.

122.   Mr. Day raised concerns about department corruption and systemic abuses, which were also not part of his job duties.

123.   Mr. Day also defied his supervisors' improper orders and spoke on matters of

1   public concern in contravention of those orders, which falls outside of his

2   professional duties. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013).

3   124.   As a result of Mr. Day's protected disclosures and protected speech under the First

4   Amendment to the U.S. Constitution, the City retaliated against him by, among

5   other ways, taking adverse actions against him, including but not limited to

6   (1) creating a retaliatory hostile work environment for him, (2) giving him a

7   negative performance evaluation, (3) issuing bogus and unfounded Notices of

8   Inquiry, written reprimands and other disciplinary actions, (4) denying

9   promotional opportunities and experience that would allow him to be promotable,

10   (5) denying pay raises and bonus opportunities, and (6) terminating his

11   employment.

12   125.   The stated reasons for the Defendant's adverse actions against Mr. Day are not the

13   true reasons (or were shifting reasons), but instead are a pretext to hide

14   Defendant's retaliatory animus.

15   126.   The City made only the most cursory of efforts to conceal this fact. The Notices

16   of Inquiry that Mr. Day received make it clear that the accusations of (for example)

17   sexism against Mr. Day are, in fact, being motivated clearly and directly by his

18   whistleblowing activity. These accusations are direct acts of retaliation against

19   him for revealing improper behavior by his superiors, as evidenced by the City's

20   own words and actions.

21   127.   As a direct and proximate result of Defendant's actions, plaintiff Ian Day has

22   suffered, and continues to suffer, loss of income and other employment benefits,

23   personal humiliation, mental anguish, indignity, embarrassment, inconvenience,

24   pain and suffering, loss of enjoyment of life, and damages to his professional

25   reputation justifying an award including, but not limited to, lost wages, step

26   increases, lost promotion opportunities, leave benefits, and compensatory

27   damages against the Defendant.

28   128.   Attorney's fees should be awarded as a "prevailing party" under 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

129.   WHEREFORE, the Plaintiff requests that the Court award him the following relief:

(a)   Enter a declaratory judgment that Defendant unlawfully retaliated against Plaintiff Ian Day in violation of the First Amendment to the U.S. Constitution as applied to local governments under 42 U.S.C. § 1983;

(b)   Award reinstatement at the position and duties he held prior to his termination, with all attendant back pay, step increases, benefits and other emoluments of employment, upon proof at trial of justification for such an award;

(c)   Award of compensatory damages in excess of $100,000.000 to compensate him for the pain, suffering and indignities he has suffered as a result of the retaliation;

(d)   Award costs and reasonable attorneys' fees incurred to vindicate his civil rights in, and as a result of, this lawsuit;

(e)   Award to Plaintiff and against Defendant pre-judgment and post-judgment interest thereon;

(f)   Award such other damages and further relief as deemed just and proper.

**JURY DEMAND**

The Plaintiff requests a trial by jury on all issues of fact and damages arising herein.

/ / /

1   Dated: February 2, 2022                 Respectfully submitted,

2

3                                           KALBIAN HAGERTY, LLP

4                                            /s/ D. Michelle Douglas
                                            Eric L. Siegel (*pro hac vice*
5                                           *forthcoming*)
                                            D. Michelle Douglas (State Bar No.
6                                           019743)
                                            888 17th Street, N.W., Suite 1200
7                                           Washington, D.C. 20006
                                            Telephone: (202) 223-5600
8                                           Facsimile: (2020) 223-6625
                                            E-mail: esiegel@kalbianhagerty.com
9                                           E-mail: mdouglas@kalbianhagerty.com

10                                          LUBIN & ENOCH, P.C.

11                                          Nicholas J. Enoch (State Bar No.
                                            016473)
12                                          Clara S. Acosta (State Bar No. 036044)
                                            349 North Fourth Avenue
13                                          Phoenix, Arizona 85003
                                            Telephone: (602) 234-0008
14                                          Facsimile: (602) 626-3586
                                            E-mail: nick@lubinandenoch.com
15                                          E-mail: clara@lubinandenoch.com

16                                          Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28